**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK B. CAGE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:17-cv-07621** |
| **vs.** | ) | |
| | ) | |
| **TIFFANY HARPER, NICHOLAS** | ) | |
| **GOWEN, KAMBIUM BUCKNER,** | ) | |
| **DR. MARSHALL HATCH, SR.,** | ) | |
| **DR. HORACE SMITH, and DR.** | ) | |
| **RACHEL LINDSEY, in their individual** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Plaintiff Patrick B. Cage ("Plaintiff" or "Mr. Cage"), states for his Complaint against the

members of the Board of Trustees (the "Board") of Chicago State University (the "University"),

and the President of the University in their individual capacities as follows:

**INTRODUCTION**

1.      For more than seven years Mr. Cage served as General Counsel for the University.

During his tenure, he was consistently rated as meets or exceeds expectations in his annual written

performance reviews.

2.      In early 2017, Mr. Cage reported concerns about the conduct of certain Board

members to the Chair of the Board, Defendant Dr. Marshall Hatch, Sr. At the time, Mr. Cage was

not legal counsel to the Board and had no duty to express his concerns about unethical and unlawful

conduct of the Board members to the Board Chair. The Board had its own legal counsel. The

conduct of the Board is governed by the University Bylaws, and by state and federal law.

1

3.    Mr. Cage told Defendant Hatch that a newly appointed Board member, Paul Vallas, was using his position as a Board member to obtain a paid leadership position with the University in violation of the University's Bylaws. Article VIII of the Bylaws addresses conflicts of interest, stating that a "conflict of interest is present whenever a trustee, officer, or employee has a material personal interest in a proposed contract or transaction to which the corporation is a party." The Bylaws also specifically provide that a trustee may not "use personal influence" on a matter for which they have a "duality of interest."

4.    After Mr. Cage reported his concerns to Defendant Hatch, Board members began discussing terminating Mr. Cage's employment. At the same time, Mr. Vallas resigned from the Board and the very next day was appointed to a full-time position with the University by the same Board that he had been lobbying for a paid position while on the Board.

5.    Within weeks of Mr. Vallas obtaining a paid position with the University, Mr. Cage's employment was terminated. He had received no criticisms of his performance beforehand, no notice of any allegations against him, and no hearing. Rather, in the same meeting, he was told for the first time that his employment was being terminated, provided no explanation as to anything he had done or failed to do leading to the termination, and then told to pack up his belongings and leave the building immediately. He was escorted out of the building within hours by University security.

6.    The Board was aware that Mr. Cage's employment was being terminated before the termination as it had approved a severance package which was then offered to Mr. Cage at the time of his termination.

7.    At the time of Mr. Cage's termination, his employment was governed by University Regulations which specifically provide that Mr. Cage was entitled to 12 months of continued

2

employment following a notice of termination without cause. (§II, Subsection B(b)(2)). Mr. Cage was denied the twelve months of employment and instead was provided no continued employment after receiving notification of the termination. Continued employment would not only have allowed Mr. Cage to continue to receive his compensation and benefits, but would have provided time for Mr. Cage to find new employment during his final year of employment with the University to significantly enhance his chances of securing comparable employment and preserve his good reputation.

8.      The University Regulations further provide that Mr. Cage was entitled to notice and a hearing before a termination for "adequate cause" could take place. In order for the University to terminate Mr. Cage for "adequate cause," a determination as to whether "adequate cause" existed had to be made by the Board exercising "sound discretion" and such a determination was to be made after Mr. Cage had received notice and a hearing. (§II, Subsection B(c)(2); §II, Subsection B(f)(i)-(vi)). A hearing would have allowed Mr. Cage an opportunity to confront his accusers (to the extent there were any) and present evidence refuting any claims there was cause. Mr. Cage never had this opportunity.

9.      As a result of these events, Mr. Cage has suffered substantial losses, including significant damage to his previously unblemished reputation, interference with his career, and lost wages. Therefore, Mr. Cage brings this action for denial of procedural due process under 42 U.S.C. § 1983.

**THE PARTIES**

10.      Plaintiff Patrick Cage is an attorney licensed by the State of Illinois. He is a citizen of Illinois and served as General Counsel for the University from 2009 through May 22, 2017.

3

11.     Defendant Tiffany Harper is a citizen of Illinois.  She was a member of the Board at the time Paul Vallas was appointed to the Board and through the time Mr. Cage was advised of his termination.

12.     Defendant Nicholas Gowen is a citizen of Illinois.  He was a member of the Board at the time Paul Vallas was appointed to the Board and through the time Mr. Cage was advised of his termination.

13.     Defendant Kambium Buckner is a citizen of Illinois.  He was a member of the Board at the time Paul Vallas was appointed to the Board and through the time Mr. Cage was advised of his termination.

14.     Defendant Dr. Marshall Hatch, Sr. is a citizen of Illinois.  He was a member of the Board at the time Paul Vallas was appointed to the Board and through the time Mr. Cage was advised of his termination.

15.     Defendant Dr. Horace Smith is a citizen of Illinois.  He was a member of the Board at the time Paul Vallas was appointed to the Board and through the time Mr. Cage was advised of his termination.

16.     Defendant Dr. Rachel Lindsey is a citizen of Illinois.  She was President of the University at the time Mr. Cage's employment was terminated and Mr. Cage reported directly to her in his capacity as Vice President and General Counsel.

## JURISDICTION AND VENUE

17.     Jurisdiction is invoked under 28 U.S.C. § 1331 because this case involves federal questions arising under the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983").

18.     This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391 in that, inter alia, meetings related to Mr. Cage's employment were

held in this judicial district, records concerning Mr. Cage's employment are located in this judicial district, Mr. Cage worked in this jurisdiction, the University is located in this jurisdiction, and those with ultimate decision-making authority concerning the termination of Mr. Cage's employment are located in this judicial district.

## FACTS

**Plaintiff Patrick Cage was Highly Regarded by His Employer, the University, Throughout His Employment**

19.     Mr. Cage was hired by the University on November 1, 2009 to the position of General Counsel.

20.     During his tenure at the University, Mr. Cage consistently received performance reviews rating him as exceeding or extremely exceeding expectations.

21.     On June 21, 2012, Mr. Cage was featured in an article in the Chicago Daily Law Bulletin which highlighted his career in higher education and his accomplishments on behalf of the University.

**Plaintiff Patrick Cage Becomes Aware of Unethical Conduct by Paul Vallas and Certain Board Members, and Reports His Concerns to the Board Chair**

22.     On January 17, 2016, Paul Vallas was appointed to the University Board by Governor Rauner.

23.     Immediately after being appointed to the University Board, Mr. Vallas announced Governor Rauner's plan for Mr. Vallas to take the role of Chair of the University Board though a Chair was elected just one month earlier by the University's Board in accordance with Illinois law.

24.     According to Article V, Section 1 of the Bylaws, the Board Chair is elected by the Board, not appointed by the Governor.

25.     According to a Chicago Sun Times article published on March 18, 2017, Governor Rauner also intended for Mr. Vallas to be President of the University. Mary Mitchell, *Mitchell: Is Rauner pushing Paul Vallas to be president of CSU?*, Chicago Sun Times, March 18, 2017, available at https://chicago.suntimes.com/news/mitchell-is-rauner-pushing-paul-vallas-to-be-president-of-csu/. According to the Sun Times, Governor Rauner's Secretary of Education, Beth Purvis, called a meeting with Defendant Hatch and then Board member Tony Anderson and told them if "Rauner's request isn't met, he will not secure additional funding to help solve the school's financial woes and withdraw his support." At the time, the University was in dire financial condition and the funds were much needed.

26.     University Regulations, Section II, Subsection B(b)(1) provide that the President shall be employed by and serve at the pleasure of the Board, not the Governor, unless contract of employment specifies otherwise.

27.     University Regulations contain no provision stating the Governor may appoint the President of the University.

28.     Mr. Vallas does not hold an undergraduate degree in Education or any post-undergraduate degree.

29.     Mr. Vallas had no work experience in higher education at the time he was appointed to the University Board.

30.     While on the University Board, Mr. Vallas undertook to develop a strategic plan working with "pro bono" consultants, many of the same individuals who worked for him and Gary Solomon, another formerly high-paid school consultant. Vallas then began telling other Board members that it would be in the University's interest to appoint Mr. Vallas to a paid position with the University as part of Vallas' recommended strategic plan, to give him authority to lead the

University in the absence of a non-interim President, and to hold off on filling the position of President until down the road.

31.     Mr. Vallas has a long history of mixing his leadership positions at public institutions with lucrative business opportunities for the benefit of himself or his friends. For example, when Mr. Vallas became the head of the Philadelphia school system, Gary Solomon, who was the lead consultant for the Princeton Review, received $6 million from the Philadelphia public school district for consulting services.

32.     At the same time Mr. Solomon was benefitting from the lucrative contract with the Philadelphia school system, Mr. Solomon was running Solomon Consulting Services and, according to sources such as The Philadelphia School Notebook, an independent, nonprofit news service, was boasting that his firm has obtained exclusive rights to "The Vallas model." Sheila Simmons and Paul Socolar, *Cashing in on 'The Vallas model'?*, The Philadelphia School Notebook, April 29, 2005, available at thenotebook.org/articles/2005/04/29/cashing-in-on-the-vallas-model. At that time, Solomon Consulting Services employed another of Vallas' cronies, Cozette Buckney, to provide services to the Philadelphia school district though she was simultaneously working for the St. Louis school district. Reports confirm she was submitting personal expenses for reimbursement to the financially-strapped Philadelphia school district. The Philadelphia district refused to reimburse Ms. Buckney for her personal expenses and required her to reimburse the district for approximately $20,000 of improper personal expenditures for which she had already been reimbursed.

33.     Mr. Vallas also provided another of Mr. Solomon's firms, Synesi Associates, with two no-bid contracts when Vallas took the helm of the financially-strapped New Orleans school district. To help Synesi obtain the business, Mr. Vallas vouched for Synesi Associates in a series

of letters to the New Orleans school board. Dan Mihalopoulos and Lauren FitzPatrick, *Vallas, Rauner's pick for CSU, vouched for figure in CPS scandal*, Chicago Sun Times, April 17, 2017, available at https://chicago.suntimes.com/news/paul-vallas-bruce-rauners-pick-for-chicago-state-university-vouched-for-figure-in-cps-scandal-gary-solomon-synesi/. The contracts were worth in excess of $800,000. Mr. Vallas urged the board to approve the deal with the out-of-town Synesi firm, claiming no one else was qualified and competitive bidding for the work would be useless. *Id.*

34. In late 2007, Vallas was again pushing for more lucrative no-bid contracts for Solomon's firm. Vallas offered to help the Peoria school district for free, but the free advice he gave was that the district should hire Solomon's firm, Synesi Associates, to implement his recommendations at a cost of $600,000.

35. Mr. Solomon, Mr. Vallas' long time business associate, was charged with bribery and conspiracy to defraud the United States in 2016 and this year, 2017, plead guilty to wire fraud and was sentenced to over 7 years in prison. The criminal case against Solomon concerned yet another Solomon business venture, SUPES Academy, and the consulting firm Vallas had recommended to the New Orleans school district, Synesi Associates. In the matter leading to Solomon's conviction, Solomon recommended a SUPES Academy consultant, Barbara Byrd-Bennett, for the top position with the Chicago Public Schools ("CPS"). Byrd-Bennett, as the head of CPS, then paved the path for CPS to enter into lucrative no-bid contracts, totaling approximately $23 million, with SUPES Academy and Synesi Associates and in return Solomon set up a trust fund for the benefit of Byrd-Bennett that would provide for a payment to her when she left employment with the CPS.

8

36.     Former employees of Solomon's consulting firms including Byrd-Bennet, have also been charged, sentenced, and are now serving time in federal prisons. Former Synesi Associates employee, Cozette Buckney, who obtained tens of thousands of dollars in public funds for her personal benefit, was characterized by Vallas as demonstrating a "lack of judgment" when she submitted tens of thousands of dollars in personal expenses for reimbursement from the financially-strapped Philadelphia school district. Though Vallas confirmed she lost her job because of this conduct, he has now hired her, and other former Solomon associates, to work for the University.

37.     In late February 2017, Mr. Cage met for lunch with Defendant Hatch at Leona's Restaurant located at 9156 South Stoney Island Avenue in Chicago, Illinois. During this lunch, Mr. Cage discussed his concerns that Vallas' efforts to obtain the position of University President while sitting on the University Board was a conflict of interest and violated the University Bylaws. In April Mr. Cage, through counsel, sent a letter to the University Board reiterating his concerns that Vallas' conduct violated the University Bylaws. Just weeks prior to expressing these concerns to Defendant Hatch, Defendant Hatch met with Mr. Cage and other top officials of the University to discuss whether Defendant Hatch wanted to replace them. During the meeting, Defendant Hatch reassured all of them that he was pleased with their performance and had no intention of terminating their employment.

38.     The public accounts of Mr. Vallas' involvement with purported school experts who turned out to be bilking the public for millions and using public funds that could have gone to help public school students were well known to Mr. Cage when he reported his concerns to Defendant Hatch, as they would be to anyone who took the time to look. Though the Board, or its counsel, could easily have accessed this information, and though it was undisputed that Mr. Vallas was

advocating for a paid position with the University while still sitting on the University Board, no investigation was conducted in response to Mr. Cage's reported concerns about Mr. Vallas' conflict of interest and improper conduct.

**Paul Vallas' Unethical Conduct Leads to a Paid Position at the University and the Termination of Plaintiff Patrick Cage's Employment**

39.     On April 6, 2017, Mr. Vallas resigned his position on the University Board, which he had only held for three months—long enough to persuade the other Board members from the inside to approve a paid position for him.

40.     The next day, on April 7, 2017, the Board voted on whether to approve a contract with Mr. Vallas for a high-level employment position that never existed before—Chief Administrative Officer. Just days before, Chairman Hatch could not even explain specifically what the position would entail. Board Member Nikki Zollar voted against the contract with Mr. Vallas while the remainder of the Board voted in favor. After the vote, Ms. Zollar spoke concerning the ethical violations resulting from Mr. Vallas' efforts to secure the paid position while on the Board which she characterized as a conflict of interest in violation of the University's Bylaws. She had previously expressed these same concerns to Board members. While expressing her concerns, she noticed the tape recorder, which is used to record Board meetings and required when the Board is in executive session, as they were at that time for the Vallas vote, was not set to record. Ms. Zollar left the room at that time to contact the University staff member who handles the recorder and was advised by her that Defendant Hatch had given instructions to turn on the recorder but to not activate it to record.

41.     Pursuant to Illinois law, specifically 5 ILCS §120/2.06(a), all public bodies are required to keep a verbatim record of all of their closed meetings in the form of an audio or video recording.

42.     After stating her objections to the contract to hire Vallas as an employee, Ms. Zollar resigned her position as a Board member because she could not continue to participate on a Board that disregarded its legal and ethical obligations.

43.     Despite Ms. Zollar's numerous admonitions against the conduct of Mr. Vallas and the conduct of the Board, and despite Mr. Cage's expressed concerns regarding the same, the Board took no action concerning Mr. Vallas' conflict of interest and approved his contract for a paid position with the University.

44.     Article VIII of the Bylaws addresses conflicts of interest, stating that a "conflict of interest is present whenever a trustee, officer, or employee has a material personal interest in a proposed contract or transaction to which the corporation is a party."  The Bylaws also specifically provide that a trustee may not "use personal influence" on a matter for which they have a "duality of interest."

45.     At the same time that Mr. Vallas was awarded a contract for a paid position with the University, Defendant Lindsey was appointed Interim President of the University by the Board.

46.     Candidates who interviewed for the position of President during the months leading up to the appointment of Defendant Lindsey were asked if they would terminate the employment of Patrick Cage if appointed to the position.

47.     In early 2017, after Mr. Cage had expressed his concerns about Mr. Vallas' conduct to Chairman Hatch, former University President Cecil Lucy was asked by Defendants Harper and Gowen if he would be willing to terminate the employment of Patrick Cage if he was retained as President of the University. He responded that he would not and was shortly thereafter replaced by Defendant Lindsey.

11

48.     In early 2017, after Mr. Cage had expressed his concerns about Vallas' conduct to Chairman Hatch, Dr. Anne Smith, who expressed interest in the position of President, was asked by Defendant Harper if Dr. Smith would be willing to terminate Mr. Cage's employment if she were appointed President of the University. After she responded that she could not answer the question without having more information about the situation, she was not included in the formal interview process for the position of President and was not appointed as the President of the University.

49.     On or about May 15, 2017, just weeks after Mr. Vallas began employment with the University, Mr. Cage became aware that Vallas had hired away Mr. Cage's administrative assistant without his knowledge. Mr. Cage addressed this issue with Defendant Lindsey, asking her whether the rumors that Mr. Cage's employment would be terminated were true. Defendant Lindsey assured Mr. Cage there was no truth to the rumors and said she thought that Mr. Cage had resigned and specifically mentioned that doing so without giving the appropriate notice would be bad for Mr. Cage's career. Mr. Cage assured Defendant Lindsey that he had not resigned.

50.     Less than one week after the May 15, 2017 meeting, Defendant Lindsey summoned Mr. Cage to a meeting in her office. Interim Human Resource Director Lindsay Hamilton was also present at the meeting. During the meeting, Mr. Cage was notified that his employment was being terminated immediately. Defendant Lindsey stated that she had evaluated everyone on the University's senior staff to determine who has the skill set, experience, and motivation necessary to effectively help her address the significant changes the University faces and accomplish the goals set out for her by the Board. She stated that after careful consideration, she decided that Mr. Cage was not the right fit for the position of Vice President and General Counsel moving forward.

51.     Mr. Cage was then presented with a Separation Agreement and General Release. This meeting was the first in which Defendant Lindsey mentioned any concerns about Mr. Cage to him. He was first told of the termination and then given the vague reasons for the decisions.

52.     Mr. Cage was not permitted to remain employed by the University following notification of the termination.

53.     Mr. Cage was not given notice by the University of any allegations against him prior to coming into the meeting with Defendant Lindsey on May 15, 2017.

54.     Mr. Cage was not told who had provided any evidence against him that Defendant Lindsey deemed supported her decision to terminate Mr. Cage's employment.

55.     Mr. Cage was not given an opportunity to address any concerns against him prior to being notified of his termination in the May 15, 2017 meeting.

56.     The University Board members were advised in advance of the May 15, 2017 meeting between Defendant Lindsey and Patrick Cage that Mr. Cage would be terminated by Defendant Lindsey at or around the time of the May 15, 2017 meeting.

57.     University Regulations, §II, Subsection B.4, paragraph (b)(2)(c) govern the length of employment an employee in the position Mr. Cage held with the University is entitled to following notice of a termination without cause.

58.     Pursuant to University Regulations, §II, Subsection B.4, paragraph (b)(2)(c), Mr. Cage, who as of May 15, 2017 was beyond his sixth year of employment with the University, was entitled to receive notice of a termination no later than twelve months prior to the termination date specified for termination in the notice if his employment was being terminated without case.

59. Mr. Cage did not receive twelve months of employment following receipt of the notice of termination; he received 0 days of continued employment following receipt of the notice of termination. The termination occurred at the same time the notice was provided.

60. University Regulations, §II, Subsection B.4, paragraph (c)(2) through paragraph (f)(4)(c) govern the process for terminating an employee in the position Mr. Cage held with the University for cause.

61. Pursuant to University Regulations, §II, Subsection B.4, paragraph (f)(vi), before terminating Mr. Cage's employment for cause, the Board was required to be given the recommendation of the University President, a transcript of the hearing concerning termination of Mr. Cage's employment, and documentary evidence presented at the hearing.

62. Pursuant to University Regulations, §II, Subsection B.4, paragraph (f)(vi), the determination of whether there is cause to terminate Mr. Cage's employment was to be made by the Board after receipt of the recommendation of the President, the transcript of the hearing, and the documentary evidence presented at the hearing.

63. Each of the individual Defendants who were on the Board in May of 2017 was aware of Defendant Lindsey's plans to terminate Mr. Cage's employment.

64. None of the individual Defendants who were on the Board in May of 2017 received a transcript of a hearing concerning any allegations against Mr. Cage.

65. None of the individual Defendants who were on the Board in May of 2017 received any documentary evidence presented to a committee conducting a hearing into whether Mr. Cage's employment should be terminated.

66. None of the individual Defendants was present when Mr. Cage was advised that his employment was being terminated on May 15, 2017.

67.     When Mr. Cage exited the meeting with Defendant Lindsey he was met by a University security officer who escorted him to his office to collect his personal things, and he was then escorted by security off of University property.

68.     May 15, 2017 was Mr. Cage's last day of employment with the University.

**Defendants' Conduct has Damaged Plaintiff Cage Personally and Professionally**

69.     After Mr. Cage's employment was terminated, an article appeared in the Chicago Crusader disclosing that Mr. Cage had been "fired" along with the former University police chief. J. Coyden Palmer, *Chicago State fires embattled police chief*, The Chicago Crusader, May 26, 2017, available at https://chicagocrusader.com/chicago-state-fires-embattled-police-chief/. The article discloses that Patricia Walsh, the police chief, was terminated and that after she was allowed to "clear out her office" she was escorted from the campus by two University officers. The article states that Mr. Cage was fired "along with" Ms. Walsh and that just four days later the director of communications got "angry" when asked if she could confirm if Mr. Cage and Ms. Walsh were still employees and did not confirm they were. The article further states that a call to Mr. Cage's campus phone number was answered by a message that the number "was no longer taking messages" and that the "University's switchboard said they had no listing for Cage."

70.     The article accurately depicts the abrupt termination of Mr. Cage's employment.

71.     As a direct and proximate result of Defendants' conduct, Mr. Cage has suffered damages, including but not limited to, lost wages, lost benefits, loss of future employment commensurate with his experience and professional standing, loss of status and self-esteem, incidental damages, great expense, and pain and suffering in the form of emotional distress, embarrassment, and humiliation.

72.     It is clear from the evidence that it was the Board, and not Dr. Lindsey, who made the decision to terminate Mr. Cage's employment. Dr. Lindsey had minimal contact with Mr. Cage, communicated no criticisms of his performance during their short time working together, assured him that his employment would not be terminated just one week before his termination, was subjected to pre-hiring interviews by the same Board members who requested that Mr. Lucy and Dr. Smith answer questions about terminating the employment of Mr. Cage if hired, and confirmed that the individual Defendants were aware of and approved the plan to terminate Mr. Cage's employment.

73.     The Board, on the other hand, actively engaged in conduct that displayed their animosity toward Mr. Cage's concerns about Paul Vallas, including failing to investigate Mr. Cage's concerns, turning off the audio recording to prevent the discussions leading up to the vote to give Mr. Vallas a contract from being recorded as required under Illinois law, asking candidates for the position of President whether they would agree to terminate Mr. Cage's employment if hired, and ignoring their legal obligations to make the final determination of whether there was in fact adequate cause to terminate Mr. Cage's employment in accordance with and as required under the University Regulations. Accordingly, and for all of these reasons, Mr. Cage brings the following claim:

**COUNT I – Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983**
**Denial of Plaintiff Cage's Constitutional Rights to Procedural Due Process**
**(All Defendants)**

74.     Mr. Cage repeats and reasserts the allegations of paragraphs 1 through 73 as if fully restated herein.

75.     42 U.S.C. § 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

76.     The 14th Amendment to the U.S. Constitution provides that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 1.

77.     Pursuant to the University Regulations, Mr. Cage had a protected property interest, including continuing in his employment for twelve months following receipt of notice of termination without cause unless a hearing was provided establishing cause as determined by the Board.

78.     At the time of Mr. Cage's discharge on May 15, 2017, he had not been given any form of due process, including without limitation, notice of the charges and evidence against him, a hearing or any other opportunity to respond, or the chance to present evidence in his own defense and to cross-examine witnesses.

79.     Instead, Mr. Cage was invited to a meeting that had no stated purpose, arrived, and was advised that his employment was being terminated with no specific allegation of anything he had done or failed to do in carrying out his responsibilities provided to him, and was escorted by security to his office to collect his personal property and leave the University premises immediately following the meeting.

80.     Defendant Lindsey notified Mr. Cage that it was her decision, but advised him that the University Board was aware that she was taking this action as they had approved the severance agreement she was presenting him with at the time of termination.

81.     The Defendants either knew that Mr. Cage's Constitutional procedural due process rights would be violated, condoned the violation of Mr. Cage's Constitutional rights, or turned a blind eye to violation of his Constitutional rights.

**WHEREFORE** Plaintiff Mr. Cage respectfully requests the entry of judgment in his favor and against each of the Defendants as follows:

A.      An award of damages for back pay, front pay, and other equitable relief;

B.      An award of compensatory damages in an amount to be proven at trial;

C.      Punitive damages;

D.      An award of prejudgment interest;

E.      An award to Plaintiff for reasonable attorneys' fees and costs; and

F.      All other relief this Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**Dated**:  October 20, 2017

**PATRICK CAGE**

/s/ Ruth I. Major
One of His Attorneys

Ruth I. Major (ARDC No. 6205049)
The Law Offices of Ruth I. Major P.C.
30 West Monroe Street, Suite 1650
Chicago, Illinois 60603
Phone: (312) 893-7544
rmajor@major-law.com

18