# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK CAGE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-7621 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| TIFFANY HARPER, NICHOLAS GOWEN, | ) | |
| KAMBIUM BUCKNER, DR. MARSHALL | ) | |
| HATCH, SR., DR. HORACE SMITH, | ) | |
| DR. RACHEL LINDSEY, and THE BOARD | ) | |
| OF TRUSTEES OF CHICAGO STATE | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick Cage served as the General Counsel of Chicago State University from November 2, 2009 until he was fired on May 22, 2017. Cage believes that the University fired him for illegitimate reasons. According to him, he reported a potential ethics violation by a member of the Board of Trustees. But instead of taking action, the University retaliated against him and forced him out.

Cage responded by suing the former interim President, five members of the Board of Trustees, and the Board itself. The complaint includes four claims. He brings a due process claim, alleging that the University failed to pay him the full amount of his termination pay. He also brings three retaliation claims under state law and the First Amendment.

The parties filed cross motions for summary judgment. For the reasons stated below, Cage's motion for summary judgment is denied, and Defendants' motions for summary judgment are granted.

## Background

### I.     Defendants' Objections to Cage's Evidence

Before diving into the facts, the Court pauses to address one threshold issue.  Defendants objected to two types of evidence offered by Cage in his Rule 56.1 statement.  They objected to a privilege log showing communications between two attorneys for the Board, and transcripts produced from recordings of four meetings of the Board of Trustees (Cage, not the Board or the University, prepared the transcripts).  *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 4–7 (Dckt. No. 320).

The parties spilled quite a bit of ink on the issue.  Defendants made countless objections in response to Cage's Rule 56.1 statement.  *See* Defs.' Resp. to Pl.'s Rule 56.1 Statement (Dckt. No. 321); Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 4–7 (Dckt. No. 320) (listing objections to 23 of Cage's facts).  The parties submitted a sur-reply and a response to the sur-reply, too, before this Court closed the record.  *See* Defs.' Sur-Reply (Dckt. No. 363); Pl.'s Resp. to Defs.' Sur-Reply (Dckt. No. 366-1); *see also* 1/8/21 Order (Dckt. No. 370) ("As a general matter, counsel should resist the temptation to think that filing more is more persuasive.").

At the summary judgment stage, the evidence "need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).  In other words, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form."  *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) (emphasis in original).

Under Rule 56(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* Fed. R. Civ. P.

56(c)(2). "When an objection is made, the burden is on the proponent of the material to show either that the material is admissible as presented or to explain the admissible form that is anticipated in the event of trial." *See* 11 James Wm. Moore *et al.*, *Moore's Federal Practice* § 56.91[3] (3d ed. 2020). As the proponent of the evidence, Cage has the burden of showing that the privilege log and the transcripts are admissible in their current form, or that he could present the content in an admissible form at trial.

The objection related to privilege logs is not a heavy lift. Despite Defendants' protestations to the contrary, privilege logs can be admissible evidence. *See, e.g.*, *Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2014 WL 12756372, at *6 (S.D. Ind. 2014) ("[W]hile the contents of attorney-client communication are ordinarily privileged, the bare fact that communication occurred is not."). For example, an entry on a privilege log could be a statement by a party-opponent. That is, it could be an admission that a privileged communication took place on a certain day. Sometimes the existence of an attorney-client communication, in and of itself, can have a bearing on the issues at trial.

But in this case, the privilege log is not particularly germane to the issues at hand. Cage uses the privilege log to support facts that, in the end, do not impact the motions for summary judgment. So the Court does not rely on the privilege log. It makes no difference if the privilege log is fair game because the privilege log does not advance the ball.

Defendants also objected to the transcripts of Board meetings. Presenting the information in the transcripts in an admissible form at trial isn't problematic. Cage plans to call the speakers to the witness stand. He plans to use the recordings of the meetings, and transcripts of those recordings, for impeachment purposes only. *See* Pl.'s Reply in Support of Mtn. for Summ. J., at 3 (Dckt. No. 336)

Defendants don't disagree that Cage could call the persons featured on the recordings to testify at trial. Instead, they argue that Cage's transcripts are so unreliable that Cage should be barred from offering their contents at summary judgment. *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 4–6 (Dckt. No. 320). Originally, Defendants argued that the transcripts were unreliable because Cage did not submit the recordings themselves, which meant the Court could not verify them. *Id.* at 5. But since then, Cage has submitted the recordings for the Court's review, so that point is moot. *See* Recordings (Dckt. Nos. 366-5 to 366-13).

Defendants also raised concerns about the accuracy of the transcripts, particularly with respect to the speaker designations. *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 6 (Dckt. No. 320). However, if Defendants wanted to object to the accuracy of the transcripts, they should have followed the procedure that the Seventh Circuit outlined to deal with that type of issue:

> Initially, the district court and the parties should make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides. If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

*United States v. Zambrana*, 841 F.2d 1320, 1336 (7th Cir. 1988) (citations omitted).

Here, Defendants objected to Cage's transcripts, without offering versions of their own. And the evidence they produce undermining the transcripts is too general to be useful. For example, in their sur-reply, they point to a statement by one of the Board members that "there's a lot that's not in the transcripts and in that case I don't think it was intentional, just we're on a break . . . again, yeah, there's a lot that is not shown by the transcripts." *See* Defs.' Sur-Reply, at 4 n.3 (Dckt. No. 363) (quoting Zollar Dep., at 36:10 – 37:9 (Dckt. No. 309-9)). Maybe the transcripts don't reflect *every* conversation – including conversations outside of formal meetings – but that doesn't mean that the transcripts of the meetings are inaccurate.

So the Court refuses to throw out the transcripts wholesale. But the Court resolves the pending motions on other grounds, so in the end, the transcripts don't move the needle.

## II.     Facts

The submissions from the parties are, by any measure, immense. There are eight summary judgment motions. The parties submitted eight different Rule 56.1 statements, containing hundreds of facts supported by a large volume of exhibits. Not to mention the responses, and the replies.

It's a weighty record. To lighten the load, the Court sticks to the facts that provide context, and the facts that are germane to dispositive legal issues. Summary judgment is about "material" facts, *see* Fed. R. Civ. P. 56(a), so the following overview only includes facts that make a difference.

### A.     Cage's Employment

Patrick Cage became the General Counsel of Chicago State University on November 2, 2009. *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 4 (Dckt. No. 301). When he accepted the job, Cage signed an employment contract, a document that the parties call his "offer letter." *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement of Additional Facts, at ¶ 12 (Dckt. No. 335).

The employment agreement spanned only two pages. *See* Offer Letter (Dckt. No. 283-4, at 2–3 of 3). It included provisions about the effective date, his salary, his benefits, and so on. One of the provisions covered his termination rights. "If you are terminated from this position, or the funding supporting this position is not renewed, you will remain employed at the University for a period of six months at your current salary but you may be reassigned to another area to perform duties assigned by me or my designee." *Id.* (Dckt. No. 283-4, at 2 of 3).

The employment contract also stated that "[t]he Chicago State University Board of Trustees Policies and Regulations Manual . . . govern[s] your employment contract." *Id.* (Dckt. No. 283-4, at 3 of 3). That second document (the "Regulations") is a much larger document, spanning 85 pages. *See generally* Regulations (Dckt. No. 274-5). As the name suggests, the Board itself issued the Regulations. *Id.* The document has a number of sections laying out various administrative policies, including a section on employment-related policies like benefits. *Id.* at Section II (Dckt. No. 274-5, at 9–13 of 86).

Cage's employment contracts described his primary responsibilities as General Counsel as follows: "You will report to the President. You are expected to provide counsel and advice concerning compliance with federal and state statutes and regulations, provide advice for all issues relating to civil service rules and regulations, employment law, discrimination, diversity and equal employment opportunity and monitoring and resolving disputes which may lead to litigation." *See* Offer Letter (Dckt. No. 283-4, at 2 of 3).

In practice, Cage's responsibilities were broader. An outside consulting firm prepared an independent assessment of Cage's role in 2013. The firm concluded that Cage was responsible for "oversee[ing] all legal matters of the University," and was not confined to the responsibilities listed in his offer letter. *See* Job Summary (Dckt. No. 283-7, at 4 of 5); Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 12 (Dckt. No. 301). That assessment also indicated that Cage was "involved in all major decisions made" at the University, and was a "key advisor for the President of the University." *See* Job Summary (Dckt. No. 283-7, at 4 of 5). At deposition, Cage similarly painted his responsibilities with a broad brush, testifying that his "primary duty" as General Counsel was to "reduce and eliminate risk to the university." *See* Cage Dep., at 66:21-24 (Dckt. No. 283-3).

As General Counsel, Cage also had some involvement with the Board of Trustees, the eight-member entity responsible for overseeing the school and managing its President. *See* Defs.' Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 4 (Dckt. No. 341). The Board includes seven members appointed by the Governor, plus one student member. *See* 110 ILCS 660/5-15.

The parties present conflicting accounts of the nature of that involvement. However, they agree on a few key facts. First, they agree that during his (almost) nine-year tenure, Cage attended all but two Board meetings and was present during most of the private ("Executive Session") portions of the meetings. *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶¶ 12, 14 (Dckt. No. 301); *see also* Cage Dep., at 79–82 (Dckt. No. 283-3). Second, they agree that during Board meetings, Cage had at least two responsibilities. Under the Bylaws of the Board of Trustees, he was responsible for serving as "Board Parliamentarian." *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 13; Bylaws, at Article II, Section 3 (Dckt. No. 283-6, at 2 of 15). In that role, he was tasked with making sure that the meetings complied with Robert's Rules of Order. *See* Cage Aff., at ¶ 7 (Dckt. 308-10). Cage was also responsible for giving the Board a "litigation report." *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶¶ 12, 15. That task included giving a "status report on significant litigation facing the university," and answering any questions from the Board. *See* Cage Dep., at 84–85; *see also* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 12.

The parties disagree about whether, during his tenure, Cage ever served as the Board's attorney, or provided substantive legal advice to the Board itself. *See, e.g.*, Defs.' Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶¶ 5, 8–9 (Dckt. No. 341). But the Court doesn't need to resolve that issue to decide the motions at hand.

## 2.      Alleged Retaliation

The events that led to this litigation began in the winter of 2017, more than seven years into Cage's tenure as General Counsel.

In January 2017, then-Governor Bruce Rauner appointed four new members to the Board of Trustees of Chicago State University.  *Id.* at ¶ 11.  One of the new members was Paul Vallas. *Id.*

Sometime in late February, Cage began hearing reports in the media that Vallas was interested in becoming President of the University.  *Id.* at ¶¶ 13–14.  Cage believed that it would violate the Board's Bylaws for Vallas to seek a paid position (President) while sitting on the Board.  *Id.* at ¶ 15.

The Board's Bylaws are a set of rules, adopted by the Board itself, that describe how the Board functions.  *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶¶ 6–7 (Dckt. No. 301); *see generally* Bylaws (Dckt. No. 283-6).  The Bylaws explain how elections work, how the Board runs meetings, what leaderships positions and committees exist, and so on.  *Id.*

The Bylaws also include a conflict-of-interest provision, which looms large in the case at hand.  It reads:

> A conflict of interest is present whenever a Trustee, officer, or employee has a material personal interest in a proposed contract or transaction to which the corporation is a party.  This interest can occur either directly or indirectly; the Trustee or officer may be personally involved with the transaction, or may have an employment or investment relationship with an entity with which the corporation is dealing, or it may arise from some family relationship.

*Id.* at Article VIII (Dckt. No. 283-6, at 11–12 of 15).

Cage reached out to Dr. Marshall Hatch, the Chairman of the Board of Trustees, and requested a meeting to discuss his concerns about the perceived conflict involving Vallas.  *See* Defs.' Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶¶ 11, 14 (Dckt. No. 341).  They

met for lunch in late February 2017. *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 22 (Dckt. No. 301).

Cage and Dr. Hatch gave conflicting accounts of what happened at that meeting. Cage testified that Dr. Hatch admitted that he believed that Governor Rauner wanted Paul Vallas to become President of the University. *Id*. at ¶ 23. Cage told him that "Vallas could not be on the Board and lobbying for a position at the university." *Id*. But according to Dr. Hatch, no such conversation took place. Dr. Hatch testified that the two men did not discuss any topic related to Vallas or a potential conflict of interest at that meeting. *Id*. at ¶ 24; *see also* Hatch Dep., at 46:2-23 (Dckt. No. 283-10).

In March 2017, the Board officially began searching for an interim President. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement of Additional Facts, at ¶ 15 (Dckt. No. 335). Two Board members, Tiffany Harper and Nicholas Gowen, managed the search process. *See* Defs.' Resp. to Pl.'s Rule 56.1 Statement, at ¶ 19 (Dckt. No. 325). None of the parties gives a full account of how the search process worked.

At some point in March, Harper reached out by email to one potential candidate, Dr. Rachel Lindsey, about her interest in the position. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement, at ¶ 36 (Dckt. No. 301). The two women had a short back and forth. *Id.* at ¶¶ 37–38. It is not clear from the record if Harper and Gowen reached out to other candidates, and in particular, if they ever reached out to Paul Vallas.

During a Board meeting on March 27, 2017, the Board agreed to select a new interim President at their next meeting on April 7. *Id*. at ¶ 40. According to the minutes from the Executive Session, the Board discussed whether they could consider Paul Vallas for the position given that he was a sitting Board member. *Id*. at ¶ 41. Again, it's not clear whether the Board

had officially reached out to Vallas at that point, or whether this conversation was purely speculative. In any case, the minutes from that meeting reflect a discussion about whether there was a conflict of interest:

> [T]he board discussed the potential conflict of interest that may exist as Mr. Vallas being a board member who had access to significant operational university data prior to becoming a candidate for either interim president or chief administrative officer. The board discussed the perception of a conflict of interest and consider[ed] . . . it in deliberations. The board determined these issues where [sic] not significant enough to not consider Vallas for one of two roles. The board determined that Vallas will have to resign from his position on the board of trustees before being considered for a position as an employee with the university.

*Id*. (alterations in original). In other words, the minutes reflect that the Board believed they could consider Vallas for the role of President so long as he "resign[ed] from his position on the board." *Id.* One week later, on April 3, 2017, Vallas resigned from the Board. *Id*. at ¶ 42.

At that point, Cage elected to raise his concerns about a potential conflict of interest again. Late at night on April 6 (the day before the Board meeting to select a new interim President), Cage's attorney, Ruth Major, emailed a letter to all of the individual Board members. *Id.* at ¶ 44; *see also* Letter (Dckt. No. 283-24, at 2–7 of 13). The letter went on at some length about how Paul Vallas had been plotting with Governor Rauner to become President of Chicago State while sitting on the Board, and how Vallas's actions violated the Bylaws. *See* Letter, at 1–4 (Dckt. No. 283-24, at 3–6 of 13).

Near the end of the letter, Cage's attorney included a non-descript sentence claiming that Cage had suffered retaliation for raising his concerns:

> The purpose of this letter is to put the Board on notice of the numerous violations of the CSU's Bylaws and the *unlawful retaliation* by Mr. Vallas directed toward Mr. Cage and others who have voiced their opposition to his improper conduct.

*See* Letter, at 4 (Dckt. No. 283-24, at 6 of 13) (emphasis added).

But the letter was short on details. The letter did not give examples of any "unlawful retaliation" against Cage or anyone else. The record does not reveal whether any Board member responded to that email.

During the meeting on April 7, the Board appointed Dr. Rachel Lindsey as the new interim President. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement, at ¶ 51 (Dckt. No. 301). Dr. Lindsey officially accepted the position on April 17. *Id*. at ¶ 53.

Approximately six weeks later, on May 22, Dr. Lindsey met with Cage in her office. *Id*. at ¶ 54. She informed Cage that she was terminating his employment without cause because she did not believe that he was the right fit for the position. *Id*. at ¶¶ 54–55. Dr. Lindsey testified that she made that decision because she did not believe that Cage was an effective General Counsel. *Id*. at ¶ 57; *see also* Lindsey Dep., at 233:15 – 236:15 (Dckt. No. 274-16).

Dr. Lindsey offered Cage a severance package including severance pay equivalent to 44 weeks (just over 10 months) of his salary. Cage refused. *See* Pl.'s Resp. to Defs.' Rule 56.1 Statement, at ¶¶ 62–63 (Dckt. No. 301).

## C.    The Lawsuit

After he was fired, Cage brought claims against Dr. Lindsey, a number of Board members, and the Board itself. His complaint includes four Counts.

Count I is a due process claim under section 1983. Cage claims that he had a property interest in twelve months of continued employment after he was fired. *See* Second Am. Cplt., at ¶¶ 77–86 (Dckt. No. 59).

Counts II–IV are retaliation claims. Cage alleges that he was fired because he reported his belief that Paul Vallas was violating the Board's Bylaws. In particular, Counts II and III are retaliation claims under the State Officials and Employees Ethics Act, 5 ILCS 430/15-10. Count

II is against the individual defendants, and Count III is against the Board. *Id*. at ¶¶ 87–98. Count IV is a First Amendment retaliation claim under section 1983 against the individual defendants. *Id*. at ¶¶ 99–115.

After extensive discovery, the parties filed cross motions for summary judgment. Cage moved for summary judgment on the due process claim (Count I) only. The six individual defendants each filed a motion for summary judgment on Counts I, II, and IV. They filed separate motions, but the arguments are largely the same. The Board also filed a motion for summary judgment on Count III.

All told, there are eight pending motions for summary judgment.

## Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotation marks omitted).

The Court "'consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment.'" *Skiba v. Illinois Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable

inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## Discussion

### I.     The Due Process Claim (Count I)

The first Count is a due process claim against the individual defendants.  The gist of the claim is that Cage is entitled to twelve months of termination pay, but the University paid him for only six months.  Cage and the individual defendants filed cross motions for summary judgment.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To establish a due process claim, a plaintiff must demonstrate "(1) that he had a constitutionally protected property interest, (2) that he suffered a loss of that interest amounting to a deprivation, and (3) that the deprivation occurred without due process of law."  *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007).

The Court only needs to reach prong one:  whether Cage can establish that he had a "constitutionally protected property interest."  *Id.*  Cage argues that section II(B)(4)(b) of the Regulations gave him a property interest in twelve months of continued employment after his termination.  *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 10 (Dckt. No. 290).  Defendants argue that the offer letter governs, and grants him only six months of severance pay.  *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 9 (Dckt. No. 320).

The Due Process Clause presupposes the existence of property, but does not create it. Property interests "are not created by the Constitution."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Instead, "they are created and their dimensions are defined by

existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*; *see also Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021).

State law governs whether a plaintiff has a property interest in continued employment. *See Cromwell v. City of Momence*, 713 F.3d 361, 363–64 (7th Cir. 2013). Cage was employed in this state, so Illinois law determines whether section II(B)(4)(b) gave him a property interest. *Id.* ("Because property interests are created by state law, we examine [plaintiff]'s claim with reference to the law of the state where he was employed, here Illinois."); *see also Bishop v. Wood*, 426 U.S. 341, 344 (1976) (stating that whatever theory of property right a plaintiff advances, "the sufficiency of the claim of entitlement must be decided by reference to state law"); *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996).

The parties agree that if Cage has a property interest in continued employment, it stems from his employment agreement with the University. And they agree that two documents – the offer letter, and the Regulations – set the terms of his employment. Recall, the Regulations apply to Cage because his offer letter says that they do: "The Chicago State University Board of Trustees Policies and Regulations Manual [the "Regulations"] and the Chicago State University Administrative Procedures Manual govern your employment contract." *See* Offer Letter, at 2 (Dckt. No. 283-4).

Both the offer letter and the Regulations contain provisions about termination pay. So the question is how to read them together. The offer letter provided that Cage was entitled to receive pay for "six months" after termination:

> If you are terminated from this position, or the funding supporting this position is not renewed, you will remain employed at the University for a period of *six*

*months* at your current salary but you may be reassigned to another area to perform duties assigned by me or my designee.

*See* Offer Letter, at 2 (Dckt. No. 283-4) (emphasis added).

The Regulations include a provision with a more detailed scheme about the rights of terminated employees. The Regulations distinguish between the rights of the President and the rights of all other employees. The amount of the termination pay depends on the length of time that the employee worked at the University. Specifically:

b. Termination With and Without Notice.

(1) The President shall be employed by and serve at the pleasure of the Board unless [a] contract of employment specifies otherwise. The President shall receive written notice of termination, signed by the Chair of the Board, as follows:

(a) in the first or second year of employment as President, not later than six months prior to the termination date specified in the notice;

(b) in the third or subsequent years of employment as President, not later than twelve months prior to the termination date specified in the notice.

(2) *All other employees* shall be employed by the Board University and serve at the pleasure of the President and shall receive written notice of termination signed by the President (except employees whose appointment is supported by grants or contract funds) as follows:

(a) in the first year of employment at the University, not later than three months prior to the termination date specified in the notice;

(b) in the second through fifth year of employment at the University, not later than six months prior to the termination date specified in the notice; and

(c) in the sixth or subsequent year of employment at the University, not later than *twelve months* prior to the termination date specified in the notice.

Employees terminated in accordance with paragraph b (2) above shall not be entitled to invoke the procedures for hearing provided in paragraph c.

below. Their employment is at-will and subject only to the notice and additional term of employment described above. If such employees have academic rank (but not tenure) they shall not be entitled to return to a teaching position. The provisions for prior notice set forth in this paragraph b. above shall not be applicable in cases involving termination for cause, in which cases the procedures specified in paragraph c. below shall apply. Paragraph b (2) above does not apply to the removal from office of Chairs. The President shall consult with the Board prior to issuing a written notice of termination to a Provost/Vice President.

*See* Regulations, at § II(B)(4)(b) (Dckt. No. 274-5, at 26 of 86) (emphasis added).

Essentially, that section provides that every employee other than the President must receive written notice of his or her termination from the President. If an employee is fired without cause (like Cage), then the employee must receive notice a certain number of months before the "termination date." *Id.* The amount of notice depends on how long the employee has worked at the University. The amount of notice (and thus the amount of additional pay) is three months, sixth months, or twelve months, depending on the length of the employee's tenure. *Id.* An employee who has worked at least six years at the University (like Cage) is entitled to twelve months of notice (unless the employee separately agrees to a different deal).

The parties disagree about which document – the employment contract, or the Regulations – sets the amount of Cage's termination pay. Cage argues that both section II(B)(4)(b) of the Regulations *and* his employment contract applied to him. He contends that he was entitled to the *greater* of the benefits under his contract and the benefits under the Regulations. *See* Pl.'s Reply in Support of Mtn. for Summ. J., at 7 (Dckt. No. 336) ("In this case, Cage's contractual rights were created by two separate contracts, the offer letter and the Regulations, which together created more rights to severance than either one separately."). Under that reading, the offer letter merely set a six-month floor. Here, Cage worked for the University for more than six years, so the Regulations (in his view) entitled him to twelve

16

months of severance pay. That's more than six months of severance pay under his contract. So, in his view, he was entitled to twelve months of severance.

The individual defendants read the two documents much differently. In their view, the contract supplanted the Regulations to the extent that the provisions cover the same ground. So Cage is entitled to only six months of severance pay, not twelve months.

The interpretation of a contract is a question of law. *See Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 718 (7th Cir. 2021). Courts interpret a contract based on the plain language of the agreement, with the goal of giving effect to the intentions of the parties. *See Selective Ins. Co. of South Carolina v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016); *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992–93 (7th Cir. 2007). Courts stick to the four corners of a contract if the language is unambiguous. *See Platinum Supp. Ins., Inc. v. Guarantee Trust Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021). Courts can look outside the contract and consider parol evidence if the language is ambiguous, meaning that it is susceptible to more than one reasonable interpretation. *See Roberts v. Alexandria Transp., Inc.*, 968 F.3d 794, 799 (7th Cir. 2020); *see also Farmers Auto. Ins. Ass'n v. Kraemer*, 367 Ill. App. 3d 1071, 306 Ill. Dec. 292, 857 N.E.2d 691, 693 (2006) ("Where a court determines that a contract is ambiguous as a matter of law, its construction becomes a question of fact, and parol evidence is admissible to ascertain the parties' intent.").

The Court concludes that the language here is unambiguous, so there is no need to consider extrinsic evidence. And in any event, the parties do not submit extrinsic evidence about the meaning of the provisions at hand.[1] Cage did not create a genuine issue of material fact

---

[1] Cage did submit an affidavit from Renee Mitchell, who testified that she worked in the human resources department at the University and prepared Cage's offer letter for the General Counsel position. *See* Mitchell Aff. (Dckt. No. 336-6). However, there is no evidence that Mitchell communicated with

through extrinsic evidence, because he pointed to no extrinsic evidence about the meaning of those provisions.

Based on the plain language of the employment agreement, Cage was entitled to six months of termination pay, not twelve months. The employment contract was only two pages, and it didn't cover a lot of ground. But it did cover Cage's rights upon termination. The agreement included a straightforward sentence that is on point, without a lot of wiggle room: "If you are terminated from this position, or the funding supporting this position is not renewed, you will remain employed at the University for a period of six months at your current salary but you may be reassigned to another area to perform duties assigned by me or my designee." *See* Offer Letter, at 2 (Dckt. No. 283-4).

The phrase "six months" means six months, not twelve months. The provision is declaratory, providing exactly what Cage "will" receive. *Id.* There isn't a hint in the contractual language that it is merely setting a floor. That is, the text gives no indication that Cage might receive more severance (under the Regulations), depending on how long he stayed with the University.

It would have been easy for the parties to draft a provision saying that Cage would receive at least six months of severance, but might receive more under the Regulations. They could have written the agreement to say that Cage would receive "at least" or "no less than" six months of severance, but maybe more. But they did no such thing. Instead of creating a framework where Cage would receive "X or Y, whichever is greater," the agreement simply said that Cage will receive "X." *See Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) ("Illinois

---

Cage about what the contract meant. She does not offer any evidence of any communications between the parties about the meaning of the provisions in question. So the affidavit adds no value.

law imposes 'a strong presumption against provisions that easily could have been included in the contract but were not.'") (citation omitted).

Cage points to the fact that the employment agreement invokes the Regulations. "The Chicago State University Board of Trustees Policies and Regulations Manual . . . govern[s] your employment contract." *See* Offer Letter, at 3 (Dckt. No. 283-4). True enough. But note what it does not say. The agreement doesn't say that the Regulations supersede the employment contract when the two documents cover the same ground. There's no mini-contractual supremacy clause, of sorts. And saying that the Regulations "govern" the contract doesn't mean that the Regulations supplant or replace the plain terms of the contract.

The termination provision of the employment agreement is tailored to Cage. It is a specific provision of a specific contract tied to one (and only one) person. The Regulations, in contrast, are generally applicable to all employees. When a specific provision and a general provision cover the same terrain, the specific term prevails. The specific triumphs over the general. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646–47 (2012) ("[T]he specific governs the general."). That rule of construction applies to statutes and to contracts, too. *See Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 262 Ill. Dec. 376, 765 N.E.2d 513, 518 (2002) ("[I]n the event of a conflict, specific provisions are entitled to more weight in ascertaining the parties' intent than general provisions.") (citing *Water Pipe Extension, Bureau of Engineering Laborers' Local 1092 v. City of Chicago*, 318 Ill. App. 3d 628, 251 Ill. Dec. 915, 741 N.E.2d 1093, 1101 (2000)); *see also Horne*, 987 F.3d at 731; *Bank of Commerce v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016); *Medcom Holding Co. v. Baxter Travenol Labs, Inc.*, 984 F.2d 223, 227 (7th Cir. 1993) ("It is a well-settled principle of contract construction

that where a contract contains both general and specific provisions relating to the same subject, the specific provision controls.").

The "general/specific canon is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction." *See RadLAX Gateway Hotel*, 566 U.S. at 646–47. The text here gives no such indication. There's no suggestion in the agreement that it was merely setting a floor. It reads like an entirely new, easy-to-understand standard – six months of severance – not a supplemental provision that augments what's in the Regulations.

It is true that the general/specific canon applies when there is a conflict between terms of a statute or contract. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183–88 (2012) (describing the general/specific canon); *National Cable Telecommunications Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002) ("It is true that specific statutory language should control more general language when there is a conflict between the two."). And terms should be read in harmony, when possible. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 182–84 (2012) (describing the harmonious-reading canon). But here, reading the termination-pay provisions in harmony would require too much stretching, twisting, and bending. The offer letter says that Cage "will" receive "six months" of pay, with no textual hint of a possible bigger payday. Reading the provisions in harmony would require injecting wiggle room into the language that simply is not there.

The Regulations create a framework for the termination rights of employees generally, unless a specific employee cuts a different deal with the University. And here, Cage did just

that.  He entered into an employment agreement that guaranteed him six months of pay after termination.  That's where his property rights begin, and end.

Cage argues that Judge Wood (this Court's predecessor, before reassignment) already ruled that Cage was entitled to twelve months of pay after his termination.  *See* Pl.'s Mem. in Supp. of Mtn. for Summ. J., at 8–10 (Dckt. No. 290); *see* 8/30/18 Mem. Opin. and Order, at 5–9 (Dckt. No. 58) (Wood, J.).  He invokes the law of the case doctrine, too.

It is true that, as a general matter, courts do not reverse course midstream.  But the law of the case doctrine is not a hard-and-fast rule, either.  *See, e.g.*, *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000) (noting that the doctrine is "highly flexible").  That's especially true when there is a good reason to go in another direction.  *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) ("[T]he law of the case doctrine permits a court to revisit an issue if an intervening change in the law, or some other special circumstance, warrants reexamining the claim.") (internal quotation marks and citation omitted).

Here, there is a compelling reason.  When the parties briefed this Court the first time, they did not bring to Judge Wood's attention the terms of the employment agreement.  Remarkably, no party raised Cage's employment contract until the middle of the briefing on the motions for summary judgment.  It came up for the first time when the Defendants responded to Cage's motion for summary judgment.  *See* Defs.' Resp. to Pl.'s Mtn. for Summ. J., at 9 (Dckt. No. 320).

It's difficult to understand why, in an employment case, no party raised the employment agreement until the middle of the briefing on summary judgment.  But that's what happened.  When Judge Wood ruled on the motion to dismiss, the Court had the Regulations, but not the employment contract itself.  So Judge Wood had no opportunity to consider the terms of the

employment contract, let alone rule on it.  *See United States v. Capital Tax Corp.*, 2011 WL 589615, at *4 (N.D. Ill. 2011) ("[W]here one judge considers an issue on a motion to dismiss and a consecutive judge considers it at the summary-judgment stage, the second judge is 'not presented with precisely the same question in precisely the same way' as the first.") (citing *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005)).

Under his employment agreement, Cage was entitled to six months of severance pay, and only six months of severance pay.  He had no property interest in twelve months of severance. So he has no due process claim.  Cage's motion for summary judgment on Count I is denied. Defendants' motions for summary judgment on Count I are granted.

## II.     Retaliation Claims under State Law (Counts II and III)

The next two claims are retaliation claims under state law.  Cage alleges that the University fired him for engaging in protected activity, namely, expressing his belief that Paul Vallas was violating the Bylaws.  He claims that his termination violated the State Officials and Employees Ethics Act (the "Ethics Act"), 5 ILCS 430/15-10.

The Ethics Act prohibits retaliation against a state employee in certain circumstances. Specifically:

> An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee . . . [d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a *law, rule, or regulation*.

*Id.* (emphasis added).

A plaintiff has the burden to prove that "(i) the State employee engaged in conduct described in Section 15-10 and (ii) that conduct was a contributing factor in the retaliatory action alleged by the State employee."  *See* 5 ILCS 430/15-20.  So, Cage must prove that he engaged in

protected activity, and that the protected activity was a "contributing factor" in the decision to fire him. *Id.*

Once again, the Court only needs to reach the first prong: whether Cage engaged in protected activity. The statute does not apply to every complaint about every violation of every state policy. To engage in protected activity, a plaintiff must report what he or she reasonably believes is a violation of a "law, rule, or regulation." *See* 5 ILCS 430/15-10.

Cage claims that he engaged in protected activity when he complained about an alleged conflict of interest involving Paul Vallas. In his view, the Bylaws constitute a "rule" within the meaning of the statute. And he offers evidence that he reported a violation of the Bylaws on two occasions: (1) at lunch with Dr. Hatch (the Chairman of the Board) in February 2017, and (2) in his lawyer's letter to the Board in April 2017. *See* Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶¶ 44, 48 (Dckt. No. 301).

Defendants argue that the Board's Bylaws are not "rule[s]" within the meaning of the Act, so reporting a violation of the Bylaws is not a protected activity. *See, e.g.*, Def. Buckner's Mem. of Law in Support of Summ. J., at 5 (Dckt. No. 254).

The question, then, is whether the Bylaws of the Board of Trustees of Chicago State University constitute "rule[s]" within the meaning of the Ethics Act. *See generally* Bylaws (Dckt. No. 283-6). Cage reads the word "rule" in its colloquial sense, that is, an all-encompassing term for any prescription. Defendants, on the other hand, read "rule" as a term of art, meaning the byproduct of formal rulemaking by an agency.

The statute itself does not define the term "rule." *See* 5 ILCS 430/1-5 (providing definitions for the Act, but omitting "rule"). The Illinois Supreme Court has not directly

addressed the meaning of a "rule" under the Ethics Act, let alone whether the Bylaws of a State University Board of Trustees are considered "rule[s]."

This Court must predict how the Illinois Supreme Court would resolve the issue. *See Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 807 (7th Cir. 2018). This Court can consider the Illinois Supreme Court's rulings on related issues, the decisions of lower state courts, and persuasive precedent from other state and federal courts. *Id.* at 816.

This Court concludes that the Illinois Supreme Court would likely find that the Bylaws are not "rule[s]" within the meaning of the Ethics Act.

The Court starts with the statutory text. *See BP America Production Co. v. Burton*, 549 U.S. 84, 91 (2006) ("We start, of course, with the statutory text."). The Act protects the disclosure of a violation of a "law, rule, or regulation." *See* 5 ILCS 430/15-10(1). You can tell a lot about words, like people, by the company that they keep. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012) (describing the associated-words canon). And here, the word "rule" is nestled between "law" and "regulation." *See* 5 ILCS 430/15-10. A "law" (meaning a statute) and a "regulation" are the products of a formal process, and they carry the force of law. That suggests that a "rule" must go through a formal process and have legal effect, too.

Other provisions of the statute reinforce that suggestion. The Ethics Act uses the word "rule" in other provisions, and they provide clues about its meaning. The statute created the Executive Ethics Commission, and authorized the Commission to "promulgate rules," including emergency rules under the Illinois Administrative Procedure Act to get up and going. *See* 5 ILCS 430/20-15 (authorizing the Executive Ethics Commission to "adopt emergency rules under the Illinois Administrative Procedure Act to initially perform its duties under this subsection").

24

The Act includes the same authorization for the Auditor General, empowering that official to "adopt emergency rules under the Illinois Administrative Procedure Act." *See* 5 ILCS 430/30-5.

Each time, the statute links the word "rules" to a formal rulemaking process under the Illinois APA. The statute says something similar for the Legislative Ethics Commission. The provision does not expressly invoke the APA. But it does authorize that body to "promulgate rules," and it expressly requires notice and comment before the rules go into effect. *See* 5 ILCS 430/25-15.

Adjacent verbs are suggestive, too. The Ethics Act authorizes the various Ethics Commissions to "promulgate rules." *See* 5 ILCS 430/20-15; 5 ILCS 430/20-55; 5 ILCS 430/25-15; 5 ILCS 430/25-55; *see also* 5 ILCS 430/25-95 ("rules promulgated"). And it refers to "rules adopted" by the appropriate Ethics Commission or the Auditor General. *See* 5 ILCS 430/10-15(4), (5). The verbs "promulgate" and "adopt[]" in this setting suggest a formal process. *See Promulgate*, Black's Law Dictionary (11th ed. 2019) (third definition) ("*Administrative law.* (Of an administrative agency) to carry out the formal process of rulemaking by publishing the proposed regulation, inviting public comments, and approving or rejecting the proposal."); *Adopt*, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/adopt (last visited July 16, 2021) (third definition) ("to accept formally and put into effect").

Viewing those provisions together, the statute creates the sense that not every policy counts as a "rule." A "rule" under the Act is the byproduct of a formal rulemaking process.

That reading finds support in the one and only Illinois appellate decision that has addressed this issue. *See Snow v. Dep't of Human Servs.*, 2019 IL App (4th) 180060-U

(unpublished). In *Snow*, the Illinois appellate court considered whether an "internal parking policy" was a "rule" within the meaning of the Ethics Act. *Id.* at ¶ 37.

The court interpreted the term "rule" by looking to a definition in a different statute, the Illinois Administrative Procedure Act. *Id.* at ¶ 38. The Illinois APA defines a "rule" as an "agency statement of general applicability that implements, applies, interprets, or prescribes law or policy." *See* 5 ILCS 100/1-70; *cf.* 5 U.S.C. § 551(4) (defining a "rule" under the federal APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . .").[2]

Internal operating procedures do not count as "rule[s]" under the Illinois APA. In fact, the text of the statute includes a carve-out for internal policy matters. "'Rule' . . . does not include (i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency." *See* 5 ILCS 100/1-70.

A "rule" thus points outward, to the general public. A policy that governs the internal management of a government entity isn't a "rule," at least not in the sense used under the Illinois APA. "[A] rule does not include an agency determination concerning its internal management that does not affect private rights and procedures available to persons or entities outside the agency." *See Snow*, 2019 IL App (4th) 180060-U, at ¶ 38.

---

[2] *See Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C. Cir. 1980) (distinguishing "administrative rules that carry the force of law" from, among other things, "internal house-keeping measures organizing agency activities").

That reading is consistent with other case law from the Illinois appellate courts and the Illinois Supreme Court. Time and again, courts have recognized that internal policies and procedures do not constitute "rule[s]" within the meaning of the APA. *See, e.g.*, *Meyers v. Schmitz*, 2018 IL App (4th) 170395-U, at ¶¶ 77–78 (2018) ("Plaintiff has not demonstrated that the Department's 'substantially similar' determinations qualify as rules within the meaning of the APA. . . . [A] rule does not include an agency determination concerning its internal management that does not affect private rights and procedures available to persons or entities outside the agency. . . . The 'substantially similar' determinations or results of the survey are merely a guide for the Department to ascertain who may apply . . . ."); *Alternate Fuels, Inc. v. Director of Illinois EPA*, 215 Ill. 2d 219, 294 Ill. Dec. 32, 830 N.E.2d 444, 459–60 (2004) (holding that an agency's statements did not qualify as rules because "[s]uch statements do not affect private rights or procedures available to specific entities outside the Agency"); *Donnelly v. Edgar*, 117 Ill. 2d 59, 109 Ill. Dec. 176, 509 N.E.2d 1015, 1018 (1987) (holding that internal operating procedures that "merely prescribe[d] an internal method for maintaining consistency among the Secretary's decisions" on driving permits were not a rule); *Walk v. Illinois Dep't of Children and Family Servs.*, 399 Ill. App. 3d 1174, 339 Ill. Dec. 298, 926 N.E. 2d 773, 783 (2010) (holding that a policy guide was not a rule for purposes of the Illinois APA because it "merely alerts its employees" to an existing rule and "does not expand the circumstances" in which DCFS would make abuse or neglect determinations).

The *Snow* court also considered how the policy in question came into effect. "The plain language of section 15-10(1) of the Ethics Act draws a distinction between policies and rules." *See Snow*, 2019 IL App (4th) 180060-U, at ¶ 41. A policy isn't a "rule" unless it was the byproduct of formal rulemaking.

As the court in *Snow* observed, "formal rulemaking requires a rule to conform to the public notice and comment requirements of the APA and be filed with the Secretary of State." *Id.* at ¶ 40; *see also* 5 ILCS 100/5-5 ("All rules of agencies shall be adopted in accordance with this Article."); 5 ILCS 100/5-6 ("All rulemaking authority . . . is conditioned on the rules being adopted in accordance with all provisions of this Act . . . ."); 5 ILCS 100/5-10(c) ("No agency rule is valid or effective against any person or party, nor may it be invoked by the agency for any purpose, until it has been made available for public inspection and filed with the Secretary of State as required by this Act."); 5 ILCS 100/5-35 (entitled "Procedure for rulemaking"); 5 ILCS 100/5-80 (entitled "Publication of rules"); 5 ILCS 100/1-90 (defining "Rulemaking" and establishing requirements).

A rule comes from rulemaking. And if there wasn't rulemaking within the meaning of the APA, the policy isn't really a "rule" within the meaning of the APA, or by extension, the Ethics Act.

Based on those standards, the court in *Snow* concluded that the internal parking policy was not a "rule" within the meaning of the Ethics Act. The parking policy at issue was "not a matter of public concern or general applicability." *See Snow*, 2019 IL App (4th) 180060-U, at ¶ 39. And the parking policy was not the byproduct of formal notice-and-comment rulemaking. *Id.* at ¶ 40 ("The internal parking policy did not require enactment through formal rulemaking procedures or codification in the Illinois Administrative Code."). It sprang into existence through internal agency action. It was a policy created inside the agency, to govern the internal operations of the agency. So it was a policy – an internal operating procedure – but it wasn't a "rule."

Based on those yardsticks, the Bylaws of the Board are not "rule[s]" within the meaning of the Ethics Act. The Bylaws do not apply to the public at large, but rather set internal policies for how the Board conducts its business. The Bylaws also did not come into existence through formal notice-and-comment rulemaking. Instead, the Board simply adopted them. *See generally* Bylaws, at Article X (Dckt. No. 283-6, at 13 of 15). In sum, the Bylaws set parameters for how the Board does its job, but they do not count as "rule[s]" within the meaning of the Act.

Rules come from agencies, after a formal process, and they apply to the public at large. This case does not check those boxes. Agencies promulgate rules, but the Board of the Chicago State University is not an agency. Rules come from a formal rulemaking process, but the Bylaws did not pass through that process. Rules look outward and apply to the general public, but the Bylaws look inward and cover the Board's internal operations.

The parties do not cite the enabling statute that created Chicago State University in the first place. But the Court took a look to see how it describes the Board's powers. The Chicago State University Act empowers the Board to "make rules, regulations and bylaws." *See* 110 ILCS 660/5-45. At first blush, that provision might suggest that Bylaws could be "rule[s]" under the Ethics Act, because the Board has the authority to make "rules." *Id.* Courts assume that the same term has the same meaning in the same statute, but that's less true when comparing two different statutes. *See, e.g.*, *People v. Teschner*, 81 Ill. 2d 187, 40 Ill. Dec. 818, 407 N.E.2d 49, 52 (1980) ("We have held on previous occasions that the term 'probation' may have different meanings in different statutes."); *Nessen Transp. Co. v. Larsen*, 290 Ill. App. 22, 7 N.E. 2d 765, 767 (1937) ("Obviously the term 'seaman' may not have the same meaning in all statutes."). So, the use of the term "rule" in the Ethics Act may not mean the same thing as the term "rule" in the Chicago State University Act.

On closer inspection, however, the statute confirms that the Bylaws aren't "rule[s]" at all. The statute authorizes the Board to make "rules, regulations *and* bylaws." *See* 110 ILCS 660/5-45. The most natural reading of that phrase is that "bylaws" aren't "rules." They're listed separately because they're different.

Cage reads the term "rule" in its broadest sense to cover any and all directives from a state body. In his view, the term "rule" would function as a kind of catchall, covering any state directive other than laws or regulations. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 9–13 (Dckt. No. 329).

But the structure of the statute makes it unlikely that the word "rule" functions as a catchall. For one, if "rule" was a catchall term for state policies, then the terms "law" and "regulation" would be superfluous. There wouldn't be much need for the references to "law" and "regulation" if "rule" covered everything anyway. *See People v. Baskerville*, 2012 IL 111056, 357 Ill. Dec. 500, 963 N.E.2d 898, 905 (2012) ("This interpretation is also consistent with our obligation to avoid a construction which renders a part of the statute superfluous or redundant, and instead presume that each part of the statute has meaning.").

Sometimes words in statutes have overlapping meaning. *See, e.g., Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–02 (2019). And sometimes legislatures put a catchall term in a phrase, to cover all the bases. But the placement of the word "rule" suggests that's not what happened here. It would be unnatural to place the catchall term in the middle of a phrase. By way of comparison, the phrase "Michael Jordan, basketball players, and Lebron James" isn't something that most people would say. "Basketball players" makes the point, but if there is a need for a catchall, it's more natural to put it at the end.

Cage puts forward a highly generalized definition of the word "rule." In his view, "rule" means a "prescribed guide for conduct or action" or a "regulation or bylaw governing procedure or controlling conduct." *See Rule*, Merriam-Webster Dictionary Online, available at https://www.merriam-webster.com/dictionary/rule (last visited July 16, 2021). He insists that courts assume that "the legislature intended the term to have its ordinary and popularly understood meaning." *See People v. Maggette*, 195 Ill. 2d 336, 254 Ill. Dec. 299, 747 N.E.2d 339, 347 (2001).

That's true, as far as it goes. Dictionaries can add value. But here, the surrounding text of the same statute provides context, and offers more telling clues about the meaning of the term. *See Dynak v. Bd. of Educ. of Wood Dale Sch. Dist. 7*, 2020 IL 125062 , 444 Ill. Dec. 651, 164 N.E.3d 1226, 1231 (2020) ("Statutory terms cannot be considered in isolation but must be read in context to determine their meaning."). It's not particularly surprising that Webster's included a sweeping definition of a word that has a wide application in lots of contexts. It needed to cover rules such as "No Shirt, No Shoes, No Service," "Don't Feed the Bears," and everyday rules in every American household. But here, the context was the Ethics Act, and all of the clues suggest a more specialized meaning.

Illinois courts also "consider the consequences that would result from construing the statute one way or the other." *Id.* "In doing so, we presume that the legislature did not intend absurdity, inconvenience, or injustice." *Id.* The point is not that courts consider policy and impose their policy preferences. Rather, the point is that Illinois courts will consider the real-world implications of competing interpretations, and then evaluate which interpretation is the most natural.

It seems unlikely that a "rule" includes anything and everything. The state of Illinois employs thousands of people, many of whom create run-of-the-mill policies that govern their workplaces. The policies include when employees have to show up in the morning, what the dress code is, where they can park, and so on. If all of those policies are "rules," then the statute would sweep incredibly broadly.

It seems unlikely that a provision that protects whistleblowers also protects a person who reports a parking violation. *See* 5 ILCS 430/15-10 (note that Article 15 is entitled "Whistle Blower Protection"). It's more likely that the statute is designed to protect a report about serious conduct. It is geared toward law-breaking – like when a state official violates a statute, or a regulation, or a rule that is the product of formal notice-and-comment rulemaking.

The Bylaws of the Chicago State University are not "rule[s]" within the meaning of the Ethics Act. Defendants' motions for summary judgment on Counts II and III are granted.

## III.    Retaliation Claim under the First Amendment (Count IV)

Cage's last claim is a retaliation claim under the First Amendment. Cage alleges that the individual defendants retaliated against him after he spoke out about Vallas's potential conflict of interest. He relies on the same two communications: the lunch with Dr. Hatch and the letter from his lawyer to the Board. Defendants have moved for summary judgment, arguing that neither communication was constitutionally protected speech.

"[T]he threshold question in a public employee's First Amendment retaliation suit is whether the employee's speech was constitutionally protected." *Ulrey v. Reichhart*, 941 F.3d 255, 259 (7th Cir. 2019). The First Amendment "protects a public employee's right to speak as a citizen addressing matters of public concern under certain circumstances." *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007).

The key phrase is "speak[s] as a citizen." *Id.* When public employees make statements "pursuant to their official duties," they are not speaking as citizens, so their speech is not constitutionally protected. *Id.* (internal quotation marks and citation omitted). Accordingly, if Cage's two communications were made as part of his "official duties" as General Counsel, then his speech was not protected by the First Amendment, and his claim fails.

Defendants argue that Cage reported the violations pursuant to his duties as General Counsel. Cage responded that it wasn't his job to report violations, so he was merely acting as a citizen when he reported the misconduct.

Both the Supreme Court and the Seventh Circuit have declined to "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti v Ceballos*, 547 U.S. 410, 424 (2006); *see also Ulrey*, 941 F.3d at 259. However, the Supreme Court has held that the inquiry should be a "practical one," focusing on "the duties an employee actually is expected to perform," as opposed to strictly what's listed in their formal job description. *Garcetti*, 547 U.S. at 424–25. And the Seventh Circuit has decided a number of cases involving employees who claim that reporting misconduct fell outside their official duties. A few key principles emerge from those cases.

First, and most importantly, the Court has "repeatedly rejected . . . a whistle-blower carve-out from the category of unprotected employee speech." *Ulrey*, 941 F.3d at 259. That is, if reporting misconduct is part of an employee's job duties, then that speech is unprotected (under the First Amendment, anyway).

For example, in *Spiegla v. Hull*, 481 F.3d 961 (7th Cir. 2007), a prison guard stationed at the main gate reported her supervisor for letting a vehicle pass without checking for contraband. *Id.* at 962. The Court of Appeals held that the guard "spoke as an employee, not a citizen,

because ensuring compliance with prison security policy was part of what she was employed to do." *Id.* at 966; *see also Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (police officer reporting misconduct of co-worker); *McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 753 (7th Cir. 2013) (school principal reporting misconduct of district academic officer); *Renken v. Gregory*, 541 F.3d 769, 772 (7th Cir. 2008) (professor reporting misconduct of dean); *Vose*, 506 F.3d at 567–68 (police supervisor reporting misconduct of detectives); *Ulrey*, 941 F.3d at 258 (teacher reporting misconduct of Superintendent).

Second, reporting misconduct does not have to be one of an employee's "'core' job functions" to be part of his or her official duties. *See Spiegla*, 481 F.3d at 966 (citation omitted).

For example, in *Davis v. Cook County*, 534 F.3d 650 (7th Cir. 2008), a nurse submitted a memo to several hospital officials complaining that she had been harassed in the course of her job caring for patients. *Id.* at 652. The Court of Appeals ruled that Davis was speaking as an employee because "[w]hile drafting letters of complaint may not be a core job function of a nurse," her memo "discusse[d] patient care, advocate[d] on behalf of patients (as well as herself and similarly situated nurses), and detail[ed] difficulties encountered in working with doctors," and those issues "concern particular job responsibilities of a registered nurse." *Id*. at 653.

Similarly, in *Vose v. Kliment*, 506 F.3d 565 (7th Cir. 2007), a police sergeant in charge of the narcotics unit reported that officers in another division were violating the rules around obtaining search warrants. *Id.* at 567–68. The Court of Appeals held that Vose was speaking as an employee because, as head of the narcotics division, he had a broad responsibility to make sure the work of his unit "w[as] not compromised by some outside influence." *Id*. at 570. Search warrant violations might have eventually "affect[ed] his unit," so they fell within his job responsibilities. *Id*. Therefore, reporting the misconduct was connected to his official

responsibility to protect his division – and thus was not protected speech – even though investigating other divisions might have been "above and beyond his routine duties." *Id.*; *see also Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010) (concluding that the Chief of Surgery had a responsibility to speak on issues that "directly affected" the surgical department including "risk management, the fees charged to physicians, and surgeon abuse of prescription medications" at the hospital more generally).

Finally, even employees who have a responsibility to report misconduct can do so in a manner that falls outside their official duties. But examples of that dynamic are rare, and generally occur when a low-level employee reports misconduct outside the chain of command.

For example, in *Morales v. Jones*, 494 F.3d 590, 596 (7th Cir. 2007), the Seventh Circuit pointed approvingly to a case from the Ninth Circuit about an employee who reported misconduct. In *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), a correctional officer wrote letters to her State Senator as well as the California Inspector General to report that she was being harassed by male prisoners. *Id.* at 545. The Court of Appeals explained that, as a low-level employee, "[i]t was certainly not part of her official tasks to complain to the Senator or the IG," entities far outside the chain of command. *Id.*

By contrast, in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), the Seventh Circuit considered testimony by the Interim Administrator of the Illinois Gaming Board. *Id.* at 1079. She "publicly testified before the Illinois House Gaming Committee," the legislative committee responsible for overseeing the activities of the Gaming Board, "about the Governor and the IDOR's alleged interference with IGB operations, their alleged misuse of public funds and their alleged attempts to influence the outcome of licensing investigations and sales of

casinos." *Id.*. The Court of Appeals held that Tamayo was speaking pursuant to her official duties. *Id.* at 1091–92.

The Seventh Circuit focused on her level of responsibility, explaining that "[a]n employee with significant and comprehensive responsibility for policy formation and implementation certainly has greater responsibility to speak to a wider audience on behalf of the governmental unit." *Id.*

The Court of Appeals also took note of the relationship between the agency and the legislators. "When, as here, a complaint states that the senior administrator of an agency testified before a committee of the legislature charged with oversight of the agency about allegedly improper political influence over that agency, the natural reading of such an allegation is that the official, in so informing the legislators, was discharging the responsibilities of her office, not appearing as 'Jane Q. Public.'" *Id.* at 1092; *see also Abcarian* 617 F.3d at 937 (concluding that the Head of the Department of Surgery at a hospital had "significant authority and responsibility over a wide range of issues affecting the surgical departments at both institutions and therefore had a broader responsibility to speak in the course of his employment obligations").

As discussed in the Background section, the description of Cage's official responsibilities in his offer letter was not all-encompassing. He was responsible for "provid[ing] counsel and advice concerning compliance with federal and state statutes and regulations, provid[ing] advice for all issues relating to civil service rules and regulations, employment law, discrimination, diversity and equal employment opportunity and monitoring and resolving disputes which may lead to litigation."[3] *See* Offer Letter, at 1 (Dckt. No. 283-4). But what matters is the scope of his actual responsibilities in practice, not the description on paper.

---

[3] The Vallas issue seems related to "employment law" because it involved the ability of Vallas to become employed as the President of the University. *See* Offer Letter, at 1 (Dckt. No. 283-4). Also, that issue

In practice, Cage had a broad set of responsibilities. He was responsible for "oversee[ing] all legal matters of the University," was "involved in all major decisions made" at the University, and served as "a key advisor for the President of the University." *See* Job Summary (Dckt. No. 283-7, at 2–4 of 5). Importantly, Cage himself testified that his "primary duty" as General Counsel was to "reduce and eliminate risk to the University." *See* Cage Dep., at 66:21-24 (Dckt. No. 283-3); Pl.'s Resp. to Def. Board's Rule 56.1 Statement, at ¶ 12 (Dckt. No. 301).

Taking account of that broader description, reporting violations of the Bylaws by Board members certainly fell within Cage's official duties. As General Counsel, Cage's "primary duty" was to "reduce and eliminate risk to the University." *See* Cage Dep., at 66:21-24 (Dckt. No. 283-3). Reporting violations of the Bylaws was exactly the kind of thing that would "reduce and eliminate risk to the University," because those kinds of violations could complicate hiring decisions, create additional search costs, and result in legal consequences if there was a conflict of interest. So, this reporting fell squarely within his official duties. Maybe Cage went "above and beyond" his duties as General Counsel by investigating Vallas's interest in becoming President, because his job description did not expressly refer to proactively monitoring the Board members. *Cf. Vose*, 506 F.3d at 570. However, like the police officer in *Vose*, once Cage became aware that Vallas was engaged in conduct that could create risk for the University, it was within his official duties to report it.

Cage's high level of seniority bolsters the conclusion that reporting misconduct fell within his official duties. As General Counsel, Cage was the highest-ranking attorney at the

_____

could have given rise to a "dispute[] which may lead to litigation." *Id.* So, even if the analysis were confined to his employment contract, the Vallas issue would fall within the scope of Cage's responsibilities as General Counsel.

University. But beyond that, he was one of the highest-ranking administrative staff members, was "involved in all major decisions made" at the University, and served as "a key advisor for the President of the University." *See* Job Summary (Dckt. No. 283-7, at 2–4 of 5).

Further, little about the manner in which Cage reported the violations – at lunch with the Chair, and in a formal letter to the Board – suggests that he was speaking as a citizen rather than in his official capacity. Cage reported the violations privately, and within the chain of command. Cage did not, for example, go to the news media or make any kind of public announcement, or reach out directly to the Illinois Inspector General or to the Governor's office. Instead, he had a private conversation, and submitted a letter labeled "HIGHLY CONFIDENTIAL" to members of the Board of Trustees, the internal entity responsible for hiring the President and for enforcing the Bylaws. *See* Letter, at 1 (Dckt. No. 283-24). Speaking to the Board was part of his job.

It is true that Cage made the disclosure through an attorney, and communicating through an attorney wasn't a routine part of his job. But that's not enough to create a genuine issue of material fact. What matters is the substance of the communication, not the mouthpiece. Retaining an attorney cannot transform unprotected speech into protected speech. If reporting misconduct was part of his official duties, then the speech did not enjoy constitutional protection, even if he spoke through an agent.

Defendants' motions for summary judgment are granted.

## Conclusion

For the reasons stated above, the Court denies Cage's motion for summary judgment and grants Defendants' motions for summary judgment.

Date:   July 16, 2021

Steven C. Seeger
United States District Judge